**UNITED STATES of America**

v.

**Melvin L. GRADY, Appellant.**

**No. 71-1377.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 10, 1972.

Decided June 29, 1973.

———◆———

William W. Kramer, Washington, D. C. (appointed by this court), for appellant.

Roger M. Adelman, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry and Vincent R. Alto, Asst. U. S. Attys., were on the brief, for appellee.

Before LEVENTHAL and WILKEY, Circuit Judges, and RONALD N. DAVIES,* U. S. Senior District Judge for the District of North Dakota.

LEVENTHAL, Circuit Judge.

On this appeal from a conviction for second degree murder, we hold that the court erred in its failure to give an appropriate instruction on manslaughter advising the jury that in the event of a homicide resulting from a gross deviation from reasonable care the verdict should be manslaughter if the jury did not find malice beyond a reasonable doubt. The case is remanded for a new trial unless the Government consents to, and the trial court determines it is in the interest of justice to enter, a judgment and sentence for manslaughter.[1]

## A. Facts

The pitiful victim of the homicide was Gretchen Grady, appellant's three year old daughter. Her mother's sister Valerie heard two thumps in the Grady bedroom, heard Gretchen yelling and crying, and assumed appellant was beating Gretchen, an occurrence she testified was common. Valerie did not investigate, her previous efforts to stop appellant's beatings having proved futile.

However, her sister Eileen went to the Grady bedroom and found appellant holding Gretchen slightly off the ground and shaking her. He explained the child had been eating "rat poison." She examined Gretchen's mouth, found only baby powder, and asked why appellant was beating the child. Appellant told her to mind her own business.

Eileen left to feed her own baby, but returned shortly after on hearing a "thump." This time she found Gretchen being held at the shoulders by appellant, crying and telling her Daddy: "Don't hit me any more. Daddy, don't be an-

gry any more—I won't do it no more." Eileen asked appellant to stop, but she was again told to mind her own business and she returned to her room.

Within a couple of minutes, Eileen heard "two more thumps," rushed into the room again and found Gretchen motionless on the floor, her eyes rolled back in her head, and blood trickling from her mouth. Eileen found appellant in another bedroom, and asked what was wrong. Appellant said Gretchen was lying on the floor, being stubborn. But when they found that she was unconscious, appellant picked Gretchen up, carried her to his room, tried to find smelling salts, arranged a cab and took his child to Children's Hospital.

Appellant, aged 30, a veteran of 5 years honorable military service, testified he saw Gretchen eating baby powder and cautioned her not to do this, since it might harm her, shaking her for emphasis. When he released her, she fell backwards to the tile floor, arose and took a few steps and fell forward. He and his wife testified to his disciplining the child in terms of occasional spankings.

There was medical evidence that there was a possibility, remote, that the injury causing death was due to two falls, but the opinion of these experts focused as more likely that the subdural hematoma (collection of blood in the membrane of the brain) resulted from a sharp blow on the opposite (right) side of the skull, or the trauma of an intentional banging against the floor—as contrasted with a fall, with its "automatic check mechanisms to cushion her fall."

## B. Legal Issues

### 1. Evidence of other beatings

■ The court permitted the prosecutor to elicit from three witnessees testimony that appellant had previously beat-

---

* Sitting by designation pursuant to 28 U.S. C. § 294(d) (1970).

1. United States v. Comer, 137 U.S.App. D.C. 214, 220–221, 421 F.2d 1149, 1155–

1156 (1970); United States v. Bryant, 137 U.S.App.D.C. 124, 132–133, 420 F.2d 1327, 1335–1336 (1969); Austin v. United States, 127 U.S.App.D.C. 180, 193–194, 382 F.2d 129, 142–143 (1967).

en Gretchen with his fists, slammed her into the wall, and pushed her head down a toilet bowl. A particularly severe beating was administered eight months before the fatal occasion. We see no error. While evidence of other crimes is inadmissible merely to prove general disposition to commit crime, there are exceptions when evidence relates to a material element of the offense. Drew v. United States, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). Here there was materiality on issues of intent, and malice, and absence of mistake or accident. United States v. Bobbitt, 146 U.S.App.D.C. 224, 450 F.2d 685 (1971).

*2. Instructions*

 Defense trial counsel asked that the court refrain from an instruction on voluntary manslaughter (committed by one in the heat of passion, under the inducement of reasonable provocation). Defense counsel further requested that the court give an instruction on the lesser included offense of involuntary manslaughter. The prosecutor did not oppose this request. What the court did was to give an instruction on "manslaughter," by reference to the elements of voluntary manslaughter,[2] and on simple assault as a lesser included offense. Appellant claims there was error in the voluntary manslaughter charge as given. We do not pursue this question. It suffices for this case that we agree with his contention that the court erred in failing to give an instruction on involuntary manslaughter.

It is not necessary for present purposes to restate the discussion of the law

of involuntary manslaughter set forth in United States v. Dixon, 135 U.S.App.D.C. 401, 403, 419 F.2d 288, 290 (concurring opinion) (1969), approved in Thomas v. United States, 136 U.S.App. D.C. 222, 224, 419 F.2d 1203, 1205 (1969); United States v. Dent, 155 U. S.App.D.C. 278, 477 F.2d 447 (1973).[3] The Government's position on appeal is that there was no evidentiary basis for a finding of involuntary manslaughter, and that the evidence of prior beatings show that Gretchen's death "was not the result of an accident, but was intentional and malicious. . . . [Appellant's] testimony would support a finding of negligence, but merely simple negligence, not the gross negligence which is an element of involuntary manslaughter."

This reasoning does not suffice to support the trial court's omission. For purposes of putting the defense theory of the case to the jury, defense counsel is entitled to instructions that differ from the testimony as given by both prosecution and defense witnesses, if they conform to how the jury might not unreasonably reconstruct the situation, *e. g.*, accepting defendant's testimony in part only. Belton v. United States, 127 U.S.App.D.C. 201, 206, 382 F.2d 150, 155 (1967); United States v. Comer, *supra* note 1, 137 U.S.App.D.C. at 219, 421 F. 2d at 1154.

Defense counsel was entitled to argue to the jury that in the light of instructions to be given by the court, they could convict of murder only if they found malice—either an intentional killing, or an implied malice, due to a wanton dis-

---

2. He charged that "the offense of manslaughter required as an essential element that the defendant 'injured the deceased in the heat of passion' in response to "provocation . . . such as might naturally induce a reasonable man in the passion of the moment to lose control and permit acts on impulse and without reflection."

3. Recently, Chief Judge Greene of the Superior Court has set forth that there is still another branch of the law of manslaughter—for a homicide committed in

the course of a misdemeanor, presumably a misdemeanor involving some danger of injury. United States v. Owens, Supr.Ct. Crim. #8869–73, 101 Wash.Law Rep. 913 (May 25, 1973). We have no occasion to consider whether the prosecution, or appellant, could properly have obtained a manslaughter instruction on that theory. In any event, the effect would only have been to point toward a manslaughter verdict, and we hold that the trial court erred in another respect in failing to give a requested manslaughter instruction.

regard of human life, dependent on a finding, beyond a reasonable doubt, that defendant was aware of a serious danger to life or serious bodily injury in his actions. In the absence of a finding of such awareness and implied malice (beyond a reasonable doubt) the jury should acquit if death resulted from defendant's action only as an accident, or defendant's action was simple negligence and not a gross deviation from a reasonable man's conduct. And the jury should convict the defendant only of manslaughter if they found him guilty of reckless conduct creating an extreme danger of death or serious bodily injury by virtue of a gross deviation from the standard of care that a reasonable person would observe, even though the defendant was not aware of the risk. Arguments and instructions along these lines would focus on the difference in culpability between manslaughter, where responsibility rests on the defendant's failure to perceive the risk of death or serious bodily injury to which he has subjected another, and murder based on "implied malice," where the defendant has subjective awareness of grave risk, yet nevertheless proceeds in wanton disregard of the probable consequences.[4]

As applied to the present case, the jury might well have concluded that the appellant's beating of his child was not in a passion of hate and rage but in an intent to discipline that was carried to such unreasonable extremes as to involve a "gross deviation" and extreme risk of harm and death (possibly that appellant hit his child's head on the floor). But the jury might not have made the inference, although it could have been warranted by the evidence, that there was either intent to kill or awareness of the risk of death or serious bodily harm. Yet on the charge as given, the jury would have been unaware that manslaughter was an appropriate verdict, and might well have concluded that the case was more than simple assault, and that the instructions pointed to a murder verdict on a finding of implied malice based on endangering another by acts done recklessly (see note 3).

In accordance with our procedural jurisprudence, (see note 1) the judgment is vacated, and the case remanded with instructions to grant a new trial, unless the court determines, with consent of the Government, it is in the interest of justice to enter judgment on a verdict of manslaughter.

So ordered.

---

4. The trial judge did include "gross deviation" language in an instruction that discussed the defense based on a parent's right to control the behavior of a child. This defense involved a claim of a lawful act. The court charged it was not available if the parent's acts constituted a gross deviation from a reasonable man's conduct, which of course is sound. The charge left it open to the jury to conclude that when gross deviation negatived the defense based on right to discipline, the verdict should be murder based on implied malice—which the basic murder instruction advised "may be inferred . . . when the act imports danger to another and is done so recklessly and wantonly as to manifest depravity of mind and disregard for human life. In determining whether the unlawful act is done with malice you may infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly acted." The instruction did not communicate to the jury that in the event of gross deviation the verdict should be manslaughter (assuming there was no awareness of the risk of death or serious bodily harm).